# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LARITA A. BARNES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12-CV-282-JED-PJC |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the Court are two dispositive motions (Doc. 8, 78) filed by the United States. The first is a dismissal motion under Fed. R. Civ. P. 12(b)(1), (6), and the second is a summary judgment motion under Fed. R. Civ. P. 56. The dismissal motion and plaintiff's response thereto are premised upon exhibits other than the Complaint, and certain issues are intertwined with the merits. As a result, and given that the same issues are presented with a more complete record in the summary judgment briefing, the Court will determine these issues on the summary judgment motion and record before it. *See Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).

**I.  Background**

The undisputed facts of this case reflect another sad tale of corrupt law enforcement officers. Brandon McFadden, who was a special agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), conspired with Jeff Henderson, a Tulsa Police Department officer, to build a false criminal case against plaintiff, Larita Barnes, and her father, Larry Barnes, Sr. Ms. Barnes was convicted and imprisoned as a result.[1]

---

[1] Henderson was found not guilty of conspiring to violate the Barneses' civil rights and of several counts of perjury related to his testimony at their trial. *United States v. Henderson*, N.D. Okla. No. 10-CR-117-BDB, Doc. No. 300. As the parties in this case do not dispute the facts regarding Henderson, the allegations as to him are taken as true for purposes of this suit, although they are not binding on Henderson, who is not a party.

To set up the Barneses for false criminal charges, McFadden and Henderson instructed Ryan Logsdon, who was alleged to be a "reliable confidential informant," to provide false testimony that he purchased methamphetamine in a controlled drug buy from Larita and Larry Barnes at their home on May 8, 2007. McFadden agreed to corroborate Henderson's police report, which falsely recited that the alleged drug buy had occurred. As a result of the false accusations, Ms. Barnes was indicted in 2007 on two felony counts. Count One charged that, on May 8, 2007, she knowingly and intentionally possessed with intent to distribute, and did distribute, 50 or more grams of methamphetamine, and Count Two charged that she unlawfully maintained a location to distribute. McFadden has admitted that the charges were based upon "completely fabricated" allegations made by McFadden, Henderson, and Logsdon.

At the Barneses' federal jury trial in April 2008, Logsdon testified that he purchased three ounces of methamphetamine at the Barnes home in May 2007. Logsdon's testimony was not true. McFadden and Henderson had met with Logsdon prior to the trial to instruct him how to provide false testimony implicating Larita and Larry Barnes and to fabricate details of the fictional buy.

McFadden also provided false testimony at the Barneses' jury trial. McFadden testified that: (1) he requested $3,000 from the ATF to use for a controlled drug buy; (2) on May 8, 2007, the $3,000 was given to Logsdon to purchase drugs from Ms. Barnes; (3) McFadden and Henderson followed Logsdon to the Barnes residence on that date; (4) McFadden witnessed Logsdon approach the Barnes residence and saw Ms. Barnes greet Logsdon at the door and then go inside; (5) after approximately five minutes, McFadden saw Logsdon leave the Barnes home; and (6) Logsdon then met McFadden and Henderson at a Warehouse Market grocery store and provided McFadden and Henderson with methamphetamine which he had purchased from the

Barneses at their home. Other than his testimony that he requested and obtained $3,000 from the ATF, the entirety of McFadden's testimony about the Barneses was untrue; Logsdon did not go to the Barnes home, he did not purchase drugs from Larita Barnes, and McFadden did not witness any such visit to the Barnes home.

Ms. Barnes was found guilty of Counts One and Two and, on October 3, 2008, she was sentenced to 120 months in prison on each count, to run concurrently. Sometime in 2009, the government initiated an investigation into police corruption within the Tulsa Police Department. In the course of that investigation, the government learned that McFadden had participated in a scheme that involved stealing drugs and money, selling confiscated or stolen drugs to drug dealers for personal monetary gain, and directing others to sell drugs. The government also learned that the charges against Larita and Larry Barnes were premised upon fabricated information and that their convictions were founded only upon the perjurious testimony of Logsdon, Henderson, and McFadden. As a result, the government moved in the Tenth Circuit Court of Appeals, where Larita Barnes's appeal from her conviction was pending, for her immediate release from prison.[2] The Tenth Circuit remanded the case, and the trial court vacated Ms. Barnes's judgment of conviction, dismissed the indictment against her, and ordered that she be immediately released from federal prison. Ms. Barnes was incarcerated with the Federal Bureau of Prisons until July 2, 2009.[3]

McFadden was indicted on several counts relating to his corrupt conduct, and he ultimately pleaded guilty to conspiracy to distribute methamphetamine. During his plea

---

[2] Larry Barnes's appeal was also pending before the Tenth Circuit, and similar relief was sought as to him.

[3] Adding to the tragedy of the wrongful conviction and imprisonment of Ms. Barnes, her only son was struck and killed by a drunk driver while she was incarcerated. As a prisoner, she was not allowed to attend her son's funeral or to be with other family at that difficult time.

colloquy, McFadden admitted that he had conspired with others to distribute methamphetamine. He further summarized his conduct as follows:

> During the time period, that I used the position as a special agent with ATF to further the drug conspiracy and abused my position as a special agent. During this time, myself and Henderson seized drugs and money which were kept for our own personal benefit, falsified investigative reports, and failed to document events, and obstruct[ed] justice through falsely [sic] testimony under oath and persuading other individuals to do the same.

(Doc.78-2 at 17). He also admitted that he "testified falsely" in the Barneses' criminal trial and that he "got Ryan Logsdon to testify falsely that he made a controlled buy from the Barnes [sic] on May the 8th of 2007, when, in fact, it did not happen. Both the Barnes [sic] were convicted on jury trial based on the false testimony of myself, Logsdon, and Henderson." (*Id.* at 19).

In this suit, Ms. Barnes asserts that the United States is responsible for McFadden's wrongful conduct and for failing to "properly train, supervise, and oversee McFadden," and she alleges that "[t]hese failures, and others, were the direct cause of McFadden's repeated violation of the Constitutional rights of numerous individuals including Ms. Barnes." (*Id.*, ¶¶ 20-23). Based on the foregoing, Ms. Barnes asserts several tort claims against the United States.

## II. Summary Judgment Standards

A party may move for summary judgment on any claim or defense. Fed. R. Civ. P. 56(a). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255.

## III. Discussion

The United States seeks summary judgment on all counts, arguing that McFadden was not acting within the scope of his employment with the ATF when he committed the acts which harmed Ms. Barnes, such that the United States has not waived its sovereign immunity under the Federal Tort Claims Act ("FTCA"). The United States also argues that Ms. Barnes did not exhaust her administrative remedies and is thus barred from seeking recovery under the FTCA for any alleged negligent supervision.[4]

### A. "Within the Scope of Employment"

As a sovereign, the United States is immune from suit except to the extent that it consents to be sued. Where it has consented to suit, "the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Congress has provided a limited waiver of the sovereign immunity of the United States in the FTCA. *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 852 (10th Cir. 2005). The statute provides:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the *negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment*, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1) (emphasis added).

---

[4] Because the Court determines that these two arguments are dispositive of Ms. Barnes's claims, the Court need not address alternative arguments made by the government.

5

The United States asserts that it is entitled to dismissal or summary judgment disposal of all of Ms. Barnes's claims because McFadden was acting outside the scope of his employment at the time of the acts which resulted in her arrest, conviction, and incarceration. "Under the FTCA, the government is liable only for tortious acts committed by employees 'acting within the scope of [their] office or employment.'" *Fowler v. U.S.*, 647 F.3d 1232, 1237 (10th Cir. 2011) (quoting § 1346(b)(1)). "'Scope of employment' is determined by the law of the place" where the alleged actions occurred. *Id.*; *see* 28 U.S.C. § 1346(b)(1) ("in accordance with the law of the place where the act or omission occurred"). Here, the parties agree that Oklahoma law applies to the "scope of employment" determination.

Under Oklahoma law, "one acts within the scope of employment if engaged in work assigned, or if doing that which is proper, necessary and usual to accomplish the work assigned, or doing that which is customary within the particular trade or business." *Tuffy's, Inc. v. City of Oklahoma City*, 212 P.3d 1158, 1163 (Okla. 2009). An act by an employee is also within the scope of employment "if it is done, however ill-advisedly, with a view to further the employer's interest or arises out of an emotional response to actions being taken for the employer." *Id.* at 1166. "[A]n employing [governmental entity] is immune as a matter of law only if an officer's acts are so extreme as to constitute a clearly unlawful usurpation of authority the officer does not rightfully possess." *Id.* at 1167 (discussing *Decorte v. Robinson*, 969 P.2d 358 (Okla. 1998)). "An officer's illegal misconduct may be accomplished through an abuse of power lawfully vested in the officer, instead of by an unlawful usurpation of power the officer did not rightfully possess." *Id.* An abuse of lawful power is within the scope of employment, while an unlawful usurpation of power is not. *See id.*

"Whether a [law enforcement] officer's actions were taken within the scope of employment is a jury question unless only one reasonable conclusion can be drawn from the facts alleged." *Id.* Hence, "whether or not the act done is so different from the act authorized that it is not within the scope of the employment is decided by the court if the answer is clearly indicated." *Baker v. Saint Francis Hosp.*, 126 P.3d 602, 606-07 (Okla. 2005).

In other lawsuits involving Tulsa law enforcement corruption, district courts have concluded that similar acts by McFadden, Henderson, and other law enforcement officers were *not* within the scope of employment. For example, based upon the same conduct of McFadden and Henderson that is referenced above, plaintiff's father, Larry Barnes, Sr., filed a civil suit against the United States, McFadden, the City of Tulsa, and others. Applying Oklahoma law, the district court determined that Henderson's conduct, which contributed to Larry Barnes' prosecution and conviction, was "not within the scope of his employment." *Larry Barnes, Sr. v. United States*, No. 11-CV-582-HE, Doc. 53 at 5 (N.D. Okla. Mar. 23, 2012) (slip op.).[5]

In another suit, the plaintiff alleged that McFadden and Henderson knowingly and unlawfully searched the plaintiff's residence and stole money from the plaintiff's home. The court determined that McFadden's alleged conduct "consists of acts that are 'so extreme as to constitute a clearly unlawful usurpation of authority the officer [did] not rightfully possess," such that the conduct was outside the scope of employment and, as a result, the United States could not be held liable under the FTCA. *See Dustin Robert Eastom v. City of Tulsa*, No. 11-CV-581-

---

[5] The court in the *Larry Barnes Sr.* case did not make a similar determination regarding *McFadden's* conduct in targeting Larry Barnes, because the United States was dismissed from the case on other grounds, and McFadden had filed for bankruptcy, such that there was no reason to determine whether McFadden was acting within the scope of his employment. Nonetheless, given that McFadden and Henderson were accused of the same misconduct with respect to the Barneses, the court's determination that Henderson's actions toward Larry Barnes were not within the scope of employment is persuasive.

HE, Doc. 50 at 3-4 (N.D. Okla. July 3, 2012) (slip op.); *see also id.*, Doc. 32 at 6 (dismissing tort claim against the City of Tulsa because Henderson's alleged conduct was "so extreme as to constitute a clearly unlawful usurpation of authority" he did not possess, rendering his conduct outside the scope of his employment).

In *Haley v. City of Tulsa*, No. 10-CV-361-TDL, (N.D. Okla. May 31, 2011) (slip op.), the plaintiff had been convicted of three counts relating to possession with intent to distribute crack cocaine and cocaine powder, based upon testimony by Henderson and a purported confidential informant, Rochelle Martin, whom Henderson testified supplied information supporting a search warrant. The plaintiff filed a suit against the City of Tulsa and others based upon Henderson's misconduct. After Mr. Haley was convicted, Martin provided an affidavit stating that she had provided false testimony at a hearing on a motion to disclose the confidential informant's identity and that, in fact, she had never conducted any drug transactions with Mr. Haley and never been present with any other person conducting any such drug transaction with Haley. Martin also stated that Henderson had solicited her false testimony and she had been coached by Henderson and another police officer, Bill Yelton, on what to say in the hearing. The court dismissed Haley's tort claims against the City of Tulsa because the allegations that Henderson and Yelton had "conspired with each other to prepare a false search warrant application and to secure Ms. Martin's perjured testimony," that they "intended to illegally search and wrongfully convict" Haley, and that they "willfully, unlawfully, maliciously and feloniously use[d] the Court's process ... for an ulterior and illegal purpose" set forth actions that were outside the scope of the officers' employment as police officers. *Id.*, Doc. 52 at 7-9.

In *London v. Hill*, No. 11-CV-028-GKF, Doc. 28 (N.D. Okla. Feb. 27, 2012) (slip op.), the court determined that the City of Tulsa could not be held liable for Henderson and Yelton's

acts because the tortious conduct alleged – a cover-up conspiracy, falsifying reports, lying, and perjury – constituted bad faith conduct, and such actions were outside the scope of employment. *Id.* at 11.

Similarly, in *White v. City of Tulsa*, No. 13-CV-128-TCK, 2013 WL 4784243 (N.D. Okla. Sept. 5, 2013) (unpublished), the court concluded:

> [Tulsa Police Officer Eric] Hill's alleged tortious conduct consists of planting drugs on [plaintiff] and presenting false testimony on two separate occasions. The Court concludes that knowingly planting contraband, falsely accusing a citizen of possessing the contraband, and committing perjury in a preliminary hearing constitute an "unlawful usurpation of power" that Hill did not rightfully possess as a TPD officer. Unlike a case where an officer begins an arrest legally but then later potentially abuses that power, this case involves an entirely fabricated and illegal arrest. Only one reasonable inference can be drawn, and there is no "scope of employment" question for the jury.

*Id.* at *4; *see also White v. City of Tulsa*, 979 F. Supp. 2d 1246, 1250 (N.D. Okla. 2013) (quoting prior Sept. 5, 2013 order).

The undersigned has also found actions similar to McFadden's to be outside the scope of employment. In *Pointer v. City of Tulsa*, No. 12-CV-397-JED, 2014 WL 4244290 (N.D. Okla. Aug. 26, 2014) (unpublished), the plaintiff alleged that his residence was searched based upon a false search warrant affidavit provided by Henderson, which affidavit was alleged to be a complete fabrication, and that Henderson "illegally and unlawfully" searched and "arrested and jailed" the plaintiff and "caused a federal criminal indictment to be brought against [plaintiff]." The Court determined that the alleged actions were "so extreme as to constitute a clearly unlawful usurpation of authority [Henderson did] not rightfully possess." *Id.* at 8 (quoting *Tuffy's*, 212 P.3d at 1167). Determining that the respondeat superior claim against the City for Henderson's alleged torts should be dismissed, the Court further noted that the alleged conduct was not of a type that was "initially in good faith but which later crossed over to 'beyond the

9

bounds of good faith,'" "was also not simply 'incident to some service being performed for the employer,' and was not of the type that 'arises out of an emotional response to actions being taken for the employer.'" *Id.*

In an attempt to present an issue of fact as to whether McFadden was acting within the scope of his employment, Ms. Barnes provided an affidavit from McFadden. In his affidavit, which was signed on August 22, 2013, McFadden attempts to explain his conduct in 2007 and 2008 by asserting that "[t]he reason" he provided false testimony and information against Ms. Barnes that was "completely fabricated and made up" "was to help the United States of America, as an acting agent of the [ATF], Jeff Henderson, and the City of Tulsa to successfully prosecute the Barnes [sic] so they would subsequently be convicted of a criminal offense and therefore be imprisoned." (Doc. 82-5 at 3, ¶¶ 8-9, 10). McFadden asserts that he "did not do these acts for personal gain and ... did not receive any personal gain or benefit from these acts." (*Id.* at ¶ 11). He also claims to have been "advised on numerous occasions by [his] supervisors that increased arrests and/or convictions by the Tulsa Branch of the [ATF] would result in increased funding for the [ATF] in general, and the Tulsa office in particular." (*Id.*).

While McFadden suggests in his affidavit that the United States had an interest in convicting and imprisoning Ms. Barnes for crimes she did not commit, the undisputed facts, McFadden's prior testimony and conviction by the United States, and every reasonable inference from the record evidence, establishes otherwise. McFadden does not dispute that special agents are to base arrests on federal offenses and/or felonies:

> Special agents of the [ATF] may ... make arrests without warrant for *any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony.*

18 U.S.C. § 3051 (emphasis added) (quoted in Doc. 78 at 10, ¶ 3; Doc. 82 at 3, ¶ 1). It is undisputed that there was no "offense against the United States" or felony that was committed by Ms. Barnes, and McFadden had no reasonable grounds to believe that Ms. Barnes was committing such a felony. McFadden has admitted that the charges against her were based upon completely fabricated information. No reasonable person could find that an agent acted to help the United States when he provided "completely fabricated" testimony about a drug buy that "never even occurred" in order to wrongfully convict innocent persons. (Doc. 82-5 at 3, ¶¶ 8-9).

McFadden also asserts that (unnamed) supervisors supposedly mentioned to him (at unspecified times) that "increased arrests and/or convictions" would result in increased ATF funding (*id.* at ¶ 11).[6] Assuming that this completely nonsensical explanation were true, it does not explain or justify McFadden's egregious conduct directed at Ms. Barnes, nor does it establish that McFadden was acting in the interests of the United States when he committed perjury and set up two innocent people for convictions and extended time in federal prison based upon fabricated information.[7] The parties do not dispute that Larita Barnes spent months in federal prison for crimes she did not commit. The Court is unwilling to determine that the interest of the United States would ever be served or furthered by an agent's conduct in providing fabricated

---

[6] The United States has provided evidence that the ATF "does not have a policy of basing funding levels on performance metrics, such as number of arrests or convictions. (Doc. 78-13 at 3, ¶¶ 11-12). McFadden's suggestion otherwise is limited to his assertion of purported statements by unnamed "supervisors."

[7] If McFadden's perjury and other wrongful conduct were driven by his desire to increase funding for the ATF, why did he *take* $3,000 in ATF funds under false pretenses? (*See* Doc. 78-19). And why did he not set up hundreds of citizens residing within the Northern District of Oklahoma, in order to increase ATF funding? While the Court may not weigh the evidence at the summary judgment stage, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. On the record here, no juror could reasonably find that McFadden's conduct in conspiring to set up and wrongfully convict Larita Barnes was done for the purpose of increasing ATF funding.

testimony, counseling another witness to commit perjury, and making up events that never occurred, in order to convict persons who are innocent of the crimes charged.

McFadden's testimony at his change of plea hearing and at Henderson's criminal trial eliminated any possibility that McFadden was acting in the interests of the United States by taking and selling drugs, seizing cash for his own personal benefit, and falsely accusing innocent citizens. Summarizing some of his conduct during his plea colloquy, McFadden testified:

> I conspired with others, including Tulsa police officer, Jeff Henderson, to distribute methamphetamine in the Northern District of Oklahoma. During the time period, that I used the position as a special agent with ATF to further the drug conspiracy and abused my position as a special agent. During this time, myself and Henderson seized drugs and money which were kept for our own personal benefit, falsified investigative reports, and failed to document events, and obstruct justice through falsely testimony [sic] under oath and persuading other individuals to do the same. In 2007, myself and Henderson – Officer Henderson seized methamphetamine from a Tulsa area drug dealer named Ryan Logsdon.... [M]yself and Henderson sold the methamphetamine back to Ryan Logsdon ... [and Logsdon] later became a co-conspirator in a drug conspiracy with McFadden and Henderson. Also, in the spring of 2007, myself and [a] Tulsa police officer, who was not Jeff Henderson, performed a traffic stop on an individual who later became a co-conspirator with myself [and we] seized cash and methamphetamine ... which was kept for our own personal benefit.
>
> On or about June the 12th, 2007, myself and other Tulsa police officers, one of who [sic] was Henderson, conducted a warrantless search at a residence in Tulsa. Discovered a large sum of cash. Myself, Henderson, and other officers kept almost $10,000 of cash for their own personal benefit.
>
> In [sic] May 12 of 2008, myself and other [sic] – a Tulsa police officer made a traffic stop [and] seized a quantity of methamphetamine which was delivered to Ryan Logsdon to distribute.... Sometime in May of 2008, I provided cash to an individual who thought was conducting a law enforcement controlled buy for myself in effort [sic] to gain a downward departure in his pending federal case. Instead of being a law enforcement controlled buy, this transaction was – was actually for my own personal benefit and I actually took the drugs to Ryan Logsdon and had Logsdon distribute the drugs. On another occasion in 2008, I arranged for a drug transaction between Ryan Logsdon and an unidentified female in which the female was going to sell methamphetamine to Ryan Logsdon. During the transaction, I showed up in my capacity of a special agent with the ATF, seized the drugs and did not arrest anyone. I later sold the drugs to Ryan Logsdon, in which in turn for him to distribute it.

> In April of 2008, myself and Officer Henderson testified falsely in a criminal case in the Northern District of Oklahoma, the United States versus Larry Barnes and Larita Barnes. In the jury trial, ... myself and Henderson also got Ryan Logsdon to testify falsely that he made a controlled buy from the Barnes on May the 8th of 2007, when, in fact, it did not happen. Both the Barnes [sic] were convicted on jury trial based on the false testimony of myself, Logsdon, and Henderson.

(Doc. 78-2 at 17-19).

McFadden's testimony against Henderson also described taking drugs and money for his own personal benefit. (*See, e.g.*, Doc. 78-3 at 14-21). McFadden also testified that he knew that his actions were "not at all" a good idea (*id.* at 21), that he started taking money based upon peer pressure from Henderson and his actions thereafter were driven by greed (*id.*), and he described how he would engage in wrongful conduct only around Tulsa police officers he knew were also engaged in unlawful activities (*id.* at 24). For example, McFadden testified about his efforts, and the actions of his counterparts on the Tulsa Police Department, to engage in their wrongful conduct only within sight of other "dirty" officers, so as to avoid getting caught:

> A. When I became involved in criminal activity with Henderson, I was introduced into a network of police officers that were corrupt and doing the same things that we were dealing. J.J. Gray would be one of those officers that you could trust or people that you'd say, "He's good for it," et cetera, things of that nature. You knew that person - - you could do illegal activity around that person and they would do illegal activity around you.
>
> Q. Would you and the other officers conduct illegal activity only with other officers you knew wouldn't rat you out?
>
> A. I guess the way it -- it can be answered this way, is it depends. There's different systems where, in my experience and what I witnessed in Tulsa, people were the master manipulators of working the criminal justice system for their benefit and they were manipulating Tulsa Police protocol.... [I]f you had to have a uniform officer on a search and you knew you couldn't trust that person or you didn't know if they were dirty or not, then you simply kind of put them out of the way to do perimeter or whatever so you manipulated them to be in a place where you could still do your dirty work with the dirty police officers but these people would have no idea what was going on, if that makes sense.

(*Id.* at 24).

As noted, McFadden received $3,000 in ATF cash for the stated purpose of purchasing methamphetamine in a controlled buy, and he gave the money to Henderson. He signed and submitted a Report of Expenditures for that cash. (*See* Doc. 78-19). Under "Explanation of Expenditure," McFadden falsely reported that "Tulsa PD [Officer] J. Henderson purchased 97 grams crystal meth from suspect. receipt attached." (*Id.* at 2). The only reasonable inference from the evidence is that McFadden depleted ATF funds, rather than acting in the interests of the ATF to increase funding for the ATF.

The foregoing testimony and undisputed record in this case leads to only one conclusion: McFadden concealed his illegal activity from the ATF, and the overall conspiracy was plainly executed for the benefit of McFadden and his coconspirators, *not* the United States.

Ms. Barnes cites certain Oklahoma cases for the proposition that Oklahoma law permits employers to be held liable for the intentional torts of employees. (*See* Doc. 82 at 11-13). The cases cited are distinguishable. For example, in *Nail v. City of Henryetta*, 911 P.2d 914, 916-18 (Okla. 1996), the court found that whether a police officer was acting in the scope of employment was a jury question, because he was clearly acting within the scope of employment when he arrested and took an arrestee to jail. There was a factual dispute as to whether the officer was intentionally attempting to physically harm the plaintiff when the officer shoved him at the jail. Unlike McFadden's conduct toward Ms. Barnes, the officer in *Nail* was at least initially acting in the scope of employment, and the question is whether his conduct at some point crossed the line to exceed the scope. *See id.*

In *Baker v. Saint Francis Hosp.*, 126 P.3d 602, 605 (Okla. 2005), which is extensively quoted by Ms. Barnes, the court stated that, for an employer to be held "responsible for the tort of an employee, the tortious act must be committed in the course of the employment and within

the scope of the employee's authority." There is no question in this case as to whether McFadden was acting within the scope of his authority; he was not. There is no evidence that his superiors were aware of what he was doing to Ms. Barnes, and there is no evidence that he was given any authority to set up innocent people for criminal charges they did not commit. Indeed, McFadden acknowledged that he was among a group of "dirty" officers with whom he shared a trust – "they would do illegal activity around" one another. (Doc. 78-3 at 24). In the end, the United States convicted McFadden of a federal crime for his actions.

Unlike the conduct in cases cited by Ms. Barnes, McFadden's conduct was *not* initially in good faith, was *not* merely "incident to some service being performed for the employer," and did *not* "arise[ ] out of an emotional response to actions being taken for the employer." *Baker*, 126 P.3d at 605; *see Nail*, 911 P.2d at 618. Rather, it is undisputed that McFadden's conduct was premeditated and designed to harm innocent people and benefit himself. These are not actions that advance any governmental interest. The egregiousness of McFadden's conduct counters, rather than supports, Ms. Barnes's maintenance of any claim against the United States, because McFadden's conduct was "a clearly unlawful usurpation of authority [he did] not rightfully possess." *Tuffy's*, 212 P.3d at 1167. McFadden's conduct is so depraved that "only one reasonable conclusion can be drawn from the facts alleged," and it is clear that "the act done is so different from the act authorized that it is not within the scope of the employment," such that there is no issue for a jury to decide. *See id.*; *Baker*, 126 P.3d at 606-07.

Accordingly, the Court finds that the alleged conduct of McFadden toward Ms. Barnes was outside the scope of his employment, and the United States is not liable for that conduct.

**B.     Claim for Negligent Training and Supervision**

Ms. Barnes alleges that the ATF "failed to properly train, supervise, and oversee McFadden," which caused "McFadden's repeated violation of the Constitutional rights of

numerous individuals including Ms. Barnes." (Doc. 2 at 5, ¶ 23). The United States argues that she failed to exhaust administrative remedies on her claim of negligent training and supervision.

The filing and denial of an administrative claim is a prerequisite to bringing a civil tort claim against the United States for an employee's acts. *See* 28 U.S.C. § 2675(a). The administrative claim requires "(1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim." *Staggs v. United States*, 425 F.3d 881, 884 (10th Cir. 2005) (quoting *Cizek v. United States*, 953 F.2d 1232, 1233 (10th Cir. 1992)). Whether the claim's language is sufficient to exhaust depends upon whether it "'serves due notice that the agency should investigate the possibility of particular (potentially tortious) conduct.'" *Id.* (quoting *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 852 (10th Cir. 2005)). Where a claim is filed, but does not include facts or circumstances that provide notice of a particular claim, that claim is not exhausted. *See, e.g., Kikumura v. Osagie*, 461 F.3d 1269, 1302 (10th Cir. 2006).[8]

The administrative claim filed by Ms. Barnes was centered upon McFadden's conduct, and she did not assert that any other ATF officer or supervisor committed misconduct that caused plaintiff to be indicted or convicted. (*See* Doc. 78-17 at 4-9). The claim did not include any allegation relating to negligent supervision or training. In fact, there was no mention of supervision at all and no reference to any alleged conduct by any ATF supervisor (named or unnamed). It did not allege that any supervisor was aware of McFadden's conduct or provide

---

[8] *Kikumura* was abrogated in part by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), in which the Supreme Court announced a new standard to be applied to dismissal motions for failure to state a claim. The Tenth Circuit has continued to cite other parts of its *Kikumura* decision. *See, e.g., Pfeil v. Lampert*, _ F. App'x _, 2015 WL 727961 (10th Cir. 2015) (citing *Kikumura* on exhaustion issue); *Hinzo v. New Mexico Corrections Dep't*, 558 F. App'x 790, n.2 (10th Cir. 2014) (exhaustion issue); *al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014); *Sayed v. Profitt*, 415 F. App'x 946 (10th Cir. 2011) (unpublished) (exhaustion).

any other information that would give notice that plaintiff was asserting that inadequate supervision or training caused her injuries.

Under similar circumstances, courts in this Circuit have determined that plaintiffs failed to exhaust claims for negligent supervision. For example, in *Kikumura*, a federal prisoner sued prison officials under *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics*, 403 U.S. 388 (1971) and sued the United States under the FTCA for allegedly inadequate and indifferent medical care. 461 F.3d at 1278-79. The Tenth Circuit affirmed the district court's findings that the plaintiff failed to exhaust administrative remedies on his *Bivens* claims against four supervisory defendants because the allegations in his administrative filing were "insufficient to notify prison officials that the injuries might have been caused by inadequate training and disciplinary programs at the prison." *Id.* at 1285-86. "Since prison officials were unlikely to recognize the need to investigate these claims, the [administrative form] did not provide the prison with a fair opportunity to resolve [the plaintiff's] complaint against the Supervisory Defendants," and the claim for inadequate training and discipline was "therefore unexhausted." *Id.* at 1286. For the same reason, the Tenth Circuit concluded that the plaintiff's FTCA claim against the United States, for inadequate training and supervision, was also unexhausted:

> The final cause of action asserted in Mr. Kikumura's complaint is an FTCA claim based on the Supervisory Defendants' "negligent ... failure to provide adequate training and supervision to their staff." Am. Compl. 22. According to Mr. Kikumura, the Supervisory Defendants' negligence was the "actual and proximate cause" of his injuries. *Id.* Similar to the PLRA's exhaustion requirement, the FTCA "requires that claims for damages against the government be presented to the appropriate federal agency by filing ... a written statement sufficiently describing the injury to enable the agency to begin its own investigation." Much like the administrative grievances submitted by Mr. Kikumura in connection with his *Bivens* claims, *the administrative tort claims he filed with the BOP fail to mention the possibility that his injuries were caused by the inadequate training and supervision of ADX staff.* For the same reasons that we found Mr. Kikumura failed to exhaust his *Bivens* claim against the Supervisory Defendants, we also

17

> find that he failed to exhaust his "respondeat superior and/or supervisory liability" FTCA claim.

*Id.* at 1301-02 (internal citations omitted) (emphasis added).

In *Eastom*, cited *supra* at page 8, the plaintiff sued the government for an alleged failure to supervise McFadden. The plaintiff's administrative claim in that case was focused on "McFadden's pattern of illegal behavior" and the government's alleged failure to "disclose[ ] the information surrounding the allegations contained in the Indictments of Agent McFadden and the other officers involved in this search prior to trial." *Id.*, Doc. 50 at 4-5. The district court concluded that such allegations did not "give the ATF sufficient notice of the facts and circumstances surrounding [plaintiff's] claim for negligent supervision" and "did not put the agency on notice 'that the supervision of McFadden was called into question.'" *Id.* at 5. The court determined that the negligent supervision claim was not exhausted and dismissed the FTCA claim against the United States. *Id.* at 5-6; *see also Powell v. Nunley*, No. CIV-08-753-HE, 2009 WL 743045 (W.D. Okla. Mar. 17, 2009) (unpublished) (dismissing claims against the United States for failure to train and supervise, where the court did not read the administrative claim "as either premised on supervisory failings or on a custom or practice suggesting a failure to train").

As in *Kikumura*, *Eastom*, and *Powell*, Ms. Barnes's administrative claim included no mention of any possibility that her injuries were caused by negligent training and supervision, and that claim is unexhausted.

## IV. Conclusion

This is an unfortunate case, and the Court is sympathetic to Ms. Barnes for what she endured due to the actions of a criminal employee of the ATF and his brothers in crime. However, the United States has not waived its sovereign immunity for employee conduct like

McFadden's, which involved premeditated, unlawful conduct that was "so extreme as to constitute a clearly unlawful usurpation of authority the officer [did] not rightfully possess" and was outside the scope of his employment. *Tuffy's*, 212 P.3d at 1167.

For the foregoing reasons, the defendant's summary judgment motion (Doc. 78) is **granted**. All other motions, including the dismissal motion (Doc. 8), are **moot**. A separate judgment will be entered forthwith.

SO ORDERED this 21st day of April, 2015.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE