# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

LARITA A. BARNES, )
)
        Plaintiff, ) Case No. 12-CV-282-JED-JFJ
)
v. )
)
UNITED STATES OF AMERICA, )
)
        Defendant. )

## OPINION AND ORDER

Plaintiff, Larita A. Barnes (now Larita Laird), spent many months incarcerated on methamphetamine and related charges that were premised on false evidence presented by Brandon McFadden during his employment as a Special Agent of the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). *Ms. Barnes was actually innocent.* Pursuant to the Federal Tort Claims Act (FTCA), Ms. Barnes brought this suit against the United States, asserting that the government is responsible for the wrongful conduct of former Special Agent McFadden. Ms. Barnes asserts claims for false imprisonment, false arrest, malicious prosecution, abuse of process, and intentional infliction of emotional distress. (Doc. 2).

The Court previously dismissed Ms. Barnes's claims, based upon a determination that the undisputed facts established that McFadden was not acting within the scope of his employment such that the United States could not be held liable under the doctrine of respondeat superior. However, on appeal, the Tenth Circuit disagreed:

> As we understand Oklahoma respondeat superior law, McFadden's torts against Ms. Barnes may have been within the scope of his employment. A

> factfinder could reasonably decide that his perjury and other misconduct constituted an abuse of power lawfully vested in him rather than an "unlawful usurpation of power the officer did not rightfully possess," and that his motives included serving a government purpose.

*Barnes v. United States*, 707 F. App'x 512, 514 (10th Cir. 2017) (unpublished) (quoting *DeCorte v. Robinson*, 969 P.2d 358, 362 (Okla. 1998)). The Circuit accordingly reversed and remanded the action to this Court for further proceedings on Ms. Barnes's intentional tort claims. *Id.* at 519-520.[1]

Following remand, the United States filed a "Renewed Motion for Partial Summary Judgment on Damages," which was denied. (Doc. 178). The Court thereafter conducted a bench trial, at which five witnesses testified: Ryan Logsdon, Brandon McFadden, Ms. Barnes, Jane Duke, and Paul Vanderplow. The Court admitted into evidence Plaintiff's Exhibits (PX) 2, 7, 8, 9, 11, 12, 13, 14, 18, 28, 29, 30, 31, and 32, and Defendant's Exhibits (DX) 2, 3, 5, 8, 10, 18, 24, and 25. The Court has also taken judicial notice of certain parts of the transcripts and dockets of the underlying criminal proceedings. Pursuant to Fed. R. Civ. P. 52(a)(1), and upon consideration of the evidence admitted at trial, including the demeanor and credibility of the witnesses, the Court makes the following findings of fact, by a preponderance of the evidence, and enters the following conclusions of law.[2]

---

[1]     Ms. Barnes also previously alleged negligence claims against the United States, and those claims were dismissed for failure to exhaust administrative remedies. The Tenth Circuit affirmed dismissal of the negligence claims. 707 F. App'x at 516.

[2]     Any findings of fact that are conclusions of law shall be construed accordingly, and any conclusions of law that are findings of fact shall be construed accordingly.

# FINDINGS OF FACT

### *Notice of Claim and Initiation of Suit*

Ms. Barnes presented her administrative tort claim to the United States on June 29, 2011, less than two years after she was released from prison. The government denied the claim by letter mailed on November 15, 2011. (*See* Doc. 2 at ¶ 4; Doc. 117 at ¶ 4). In her administrative claim, Ms. Barnes provided the government notice that she was seeking personal injury damages in the amount of $5,000,000, based upon her allegations that ATF Special Agent McFadden "used his position and power to cause the false arrest, malicious prosecution and illegal incarceration of Ms. Barnes," and "committed perjury . . . and induced a witness to provide perjured testimony," which "resulted in Ms. Barnes' being wrongly convicted and imprisoned." (DX 18). Pursuant to 28 U.S.C. § 2401, Ms. Barnes timely filed this action within six months after the denial letter. (*See* Doc. 2, dated May 15, 2012).

### *Special Agent Brandon McFadden*

McFadden began his employment as a Special Agent of the ATF in the Summer of 2002. (Doc. 196 at 86). A few years later, he was assigned to the Violent Crime Impact Team. (*Id.* at 87). As part of that team, he interacted daily with officers of the Gang Unit and the Special Investigations Division of the Tulsa Police Department (TPD). (*Id.* at 88). His daily interaction with those TPD officers was the "number one source . . . of bringing cases for prosecution, whether it was state or federal." (*Id.* at 88-89).

As a Special Agent of the ATF, McFadden "occupied a position of public trust and authority." (DX 2 at ¶ 2). He was responsible for investigating potential violations of

federal firearms law and related violent crime and drug trafficking activity. (*Id.* at ¶ 3). As a "regular part of his duties," he participated in preparing search and arrest warrant affidavits, conducted searches, effectuated arrests, and conducted and participated in interviews and interrogations. (*Id.* at ¶ 5). In the course of his duties, McFadden also "routinely orchestrated, supervised, and participated in controlled drug purchases utilizing confidential informants (CIs)." (*Id.* at ¶ 6). Controlled buys involved receiving and giving CIs "buy money" and were to be documented on official ATF forms. (*See id.* at ¶¶ 6-7).

McFadden referred cases for prosecution to the United States Attorney's Office for the Northern District of Oklahoma and to the Tulsa County District Attorney's Office, which frequently involved preparation of reports documenting investigative activities and interviews. (*Id.* at 8). Those reports are relied upon by prosecuting attorneys in preparing for and presenting evidence to grand and petit juries. (*Id.*). A part of McFadden's job as a Special Agent included testifying in criminal cases in this District, before grand and petit juries, magistrates, and district judges, and he also testified before state court judges in Tulsa County, Oklahoma. (*Id.* at ¶ 9).

### *Shake Down of Ryan Logsdon and Setup of Larita Barnes*

On January 23, 2007, McFadden and TPD Officers Jeff Henderson and Frank Khalil executed a search warrant as to Ryan Logsdon. (Doc. 196 at 29-30). Ms. Logsdon testified at length about the actions of McFadden and Henderson, and the Court finds that Logsdon was a credible witness. On the date of execution of the search warrant, Henderson pulled over Logsdon's vehicle a few blocks from his home. He informed Logsdon that the officers had a search warrant for his home, directed Logsdon to sit in the front seat of Henderson's

car, and then drove to Logsdon's house to conduct the search. (*Id.* at 30-31). Prior to that

day, Logsdon did not know the three law enforcement officials. (*Id.* at 29-30).

Logsdon's girlfriend and his three-year-old son were at the house during the search.

Henderson asked Logsdon where he kept his "dope," and Logsdon responded that he did

not have any. The officers then searched the home for an hour to an hour and a half, but

found no contraband. (*Id.* at 32). Through the kitchen window, Logsdon saw Henderson

pull marijuana out of his vest and put it in the top drawer of Logsdon's toolbox in the

detached garage. (*Id.*). Henderson then returned to the kitchen and accused Logsdon of

"leav[ing] dope laying around so [his] kid can get to it," and Logsdon responded, "You

brought that" and "it's not mine." (*Id.* at 32-33). Henderson threatened Logsdon, "We're

going to take your kid, we're going to take your car, and you're going back to prison." (*Id.*

at 33).

After the threats, Logsdon asked Henderson to take his handcuffs off, and Logsdon

then showed the officers where he had hidden a kilogram of methamphetamine and

$60,000 in cash. (*Id.* at 34). Henderson put the drugs and cash in the trunk of his car. He

then asked Logsdon to set up his supplier. Logsdon called Avery Brewer and asked him to

deliver a pound of methamphetamine. Henderson arrested Brewer when he arrived. (*Id.*

at 36). Logsdon also agreed to set up others in order to avoid being arrested for the

methamphetamine in his house. (*Id.* at 39). Logsdon was not arrested.

At some point, Henderson and McFadden asked Logsdon if he knew Larry and

Larita Barnes. (*Id.* at 40). Logsdon affirmed that he knew them. Logsdon had known

Larita Barnes since childhood, as they grew up in the same neighborhood. (*Id.*). A few

months later, Henderson went to Logsdon's house, called Logsdon, and asked Logsdon to come outside to talk. Logsdon exited his house and sat in Henderson's car. Henderson pulled out four ounces of methamphetamine, which he tossed in Logsdon's lap and said, "We're going to buy this from the Barneses." (*Id.* at 41). Logsdon resisted and said he would not cooperate in "[s]etting them up. . . [m]aking a false buy." (*Id.*). Henderson told him to think about it. A few weeks later, Henderson returned and told Logsdon that they needed Logsdon to testify and say that he "bought some dope from the Barneses." (*Id.*). Logsdon again said he would not.

On another occasion, Henderson drove to Logsdon's house. McFadden was seated in the back seat of Henderson's car. (*Id.* at 42). It was late at night, during the spring of 2007. McFadden handed Logsdon a package that contained a little less than four ounces of methamphetamine. Logsdon again indicated he would not set up Larry and Larita Barnes. (*Id.* at 43).

Subsequently, McFadden showed up at Logsdon's house. When Logsdon got into McFadden's vehicle, McFadden was counting money. McFadden told Logsdon that McFadden had just checked out the money to buy from the Barneses. (*Id.* at 44). Documents show that, on May 8, 2007, McFadden requested $3,000 in ATF funds for the alleged controlled buy. His supervisor, Jeff Cochran, signed off on the request (PX 7 at USA1 00064), and the money was obtained by McFadden on May 8, 2007. (*See* PX 7). McFadden gave the $3,000 to Henderson and never saw any of the money again. (Doc. 196 at 99; *see also* PX 7 at USA1 00063-65). McFadden did not personally profit from any part of that money. (Doc. 196 at 99). A Report of Expenditures, prepared on an ATF

form, was completed and signed by McFadden, his Supervisor, Jeff Cochran, and another superior. (*See* PX 7). The money was never returned to the ATF. (*See* Doc. 197 at 300).

Henderson completed a false police report, which indicated that a reliable confidential informant had advised Henderson that Larry and Larita Barnes were selling methamphetamine. (*See* PX 2). The report contained an elaborate description of a purported methamphetamine buy on May 8, 2007 at approximately 12:15 p.m. (*id.*), despite the fact that no such buy ever occurred. (Doc. 196 at 44). McFadden knew the report was false because no controlled drug buy had occurred. (*Id.* at 105, 161).

McFadden prepared a standard Report of Investigation on an ATF form, regarding the concocted methamphetamine purchase. (*See* DX 24; Doc. 196 at 117-118). Henderson's report was attached to it. (Doc. 196 at 118). It was given to the United States Attorney's Office "to aid in the prosecution of Larry and Larita Barnes." (*Id.*). The ATF form was signed by McFadden, as well as his superior, Resident Agent in Charge of the ATF's Tulsa Field Office, Jeffrey Cochran. (DX 24).

It is undisputed that Logsdon did *not* buy drugs from Larita or Larry Barnes. (*Id.* at 44, 105, 161). On the day and time of the "drug buy" fabricated by McFadden and Henderson, Ms. Barnes was at her sister's home. (*Id.* at 190).

### False Charges Initiated Against Larita Barnes

On June 14, 2007, fictitious drug trafficking charges were filed in state court, Tulsa County Case No. CF-2007-3254, based on the fabricated evidence of a May 8, 2007 methamphetamine buy. Almost two months later, on August 10, 2007, a federal grand jury returned an indictment, which was filed under seal in Case No. 07-CV-135. The indictment

charged Larita Barnes and her father with possession of methamphetamine with intent to distribute and distribution (Count 1) and maintaining a drug premises (Count 2). (PX 9).

Despite the alleged buy occurring on May 8, 2007 and the return and filing of the federal indictment on August 10, 2007, neither Larry nor Larita Barnes were arrested on those charges for several months. Ms. Barnes was arrested in mid-December, 2007, and bond on the state methamphetamine charges was set at $100,000. (*See* Doc. 196 at 196). A bond of $2,500 was set on a separate marijuana charge. (*See* PX 28 at 12-18-2007 entry).

Larry Barnes was arraigned on the federal charges on February 12, 2018, at which time the federal indictment was unsealed. (*See* PX 8). On the same day the federal indictment was unsealed, the state methamphetamine charges against Larita Barnes were dismissed at the request of the state. Prior to the unsealing of the federal indictment on February 12, 2008, Larita Barnes was unaware of that indictment. (Doc. 196 at 196-198; *see also* Doc. 197 at 260).

### The Federal Criminal Trial and Sentencing

Ms. Barnes and her father were tried by a jury on the two-count federal indictment from April 21 to April 23, 2008. During the criminal trial, Logsdon, McFadden, and Henderson each testified, perjuriously, that Logsdon had purchased methamphetamine from Ms. Barnes and her father on May 8, 2007. Logsdon was subpoenaed to testify at the federal trial. Logsdon felt he did not have a choice but to "roll with it" and testify at the Barnes trial because, otherwise, "they'd end up taking [his] son, sending [Logsdon] to prison." (Doc. 196 at 46).

McFadden and Henderson prepared Logsdon for his false testimony. (*Id.* at 47). The first preparation session occurred when McFadden and Henderson picked up Logsdon one night, drove around Osage County, and supplied Logsdon with the fabricated details of the non-existent drug buy about which they wanted him to testify. (*Id.* at 47-48). On another occasion, Logsdon met with Henderson, McFadden, and Assistant United States Attorney (AUSA) Rob Raley. During that trial preparation meeting, Logsdon falsely indicated to AUSA Raley that Logsdon had bought methamphetamine from the Barneses. (*Id.* at 49). At trial, Logsdon testified as he had been instructed by Henderson and McFadden, providing false information about a pat down search and going to buy methamphetamine at the Barnes home, none of which actually occurred. (*Id.* at 50).

McFadden directly assisted in the prosecution of Ms. Barnes, with the approval of his ATF superiors and while he was working as a Special Agent for the ATF and carrying his badge and gun. In addition to attending the trial preparation sessions, McFadden brought Logsdon to the United States Attorney's Office (*id.* at 112), drove Logsdon to the Barneses' home to look at it for purposes of preparing his testimony (*id.* at 112-113), and he discussed Henderson's May 8, 2007 report with Logsdon (*id.* at 112-113, 162). He also worked with the United States Attorney to prepare his own trial testimony, which occurred during normal daily operating hours. (*Id.* at 113-115).

As the Case Agent assigned to the Barnes prosecution, McFadden sat at the prosecution counsel table during the trial. (Doc. 196 at 115; *see also* 07-CR-135-CVE, Doc. 100 at 4; *id.*, Doc. 101 at 314). McFadden's role, status, and training as ATF Special Agent was cited repeatedly throughout the trial (*See, e.g.*, 07-CR-135-CVE, Doc. 100, Doc.

101). McFadden himself provided false testimony against Larita and Larry Barnes during their trial. During his testimony, McFadden explained that he was the case agent who organized the case for trial, and he described his special status, experience, and training with the ATF in narcotics and drug investigations. (*See id.*, Doc. 101 at 313 et seq.).

McFadden testified that: (1) on May 8, 2007, he requested $3,000 from the ATF to use for a controlled drug buy; (2) the $3,000 was given to Logsdon to purchase drugs from Ms. Barnes; (3) McFadden and Henderson followed Logsdon to the Barnes residence on that date; (4) McFadden witnessed Logsdon approach the Barnes residence and saw Ms. Barnes greet Logsdon at the door and then go inside; (5) after approximately five minutes, McFadden saw Logsdon leave the Barnes home; and (6) Logsdon then met McFadden and Henderson at a Warehouse Market grocery store and provided McFadden and Henderson with the methamphetamine he had purchased from the Barneses at their home. (*See id.*).

Other than his testimony that he requested and obtained $3,000 from the ATF, the entirety of McFadden's testimony about the Barneses was untrue. Logsdon did not go to the Barnes home, he did not purchase drugs from Larita Barnes, and McFadden did not witness any such visit to the Barnes home. While McFadden's testimony was false, the circumstances attendant to his participation in the prosecution were within the scope of his normal participation in assisting prosecutions. (*See* DX 2 at ¶¶ 2-9).

On April 23, 2008, the jury returned guilty verdicts on both counts of the indictment against Larita and Larry Barnes. Following the guilty verdicts, the court remanded Ms. Barnes to the custody of the United States Marshal. (PX 8 at Doc. 62). On October 3,

2008, the judge sentenced Ms. Barnes to 120 months on each of Counts 1 and 2, to run concurrently.  (PX 11).

### *McFadden's Abuse of Power Lawfully Vested in Him as an ATF Special Agent*

The actions of McFadden, which resulted in the state and federal methamphetamine charges and the federal conviction and ten-year sentence of imprisonment of Ms. Barnes, were within the scope of his employment as a Special Agent of the ATF.  He abused the powers lawfully vested in him, which included working with confidential informants, completion of ATF reports, coordination with TPD officers, preparation of witnesses for testimony at trial, testifying, and serving as the case agent to assist the federal prosecution. In short, "[t]he heinous acts of McFadden that harmed Ms. Barnes were performed in the normal course of his duties."  *See Barnes*, 707 F. App'x at 518.   This finding is bolstered by the government's own evidence.  Jane Duke testified that McFadden "misused" the authority that was lawfully vested in him as an ATF agent and abused his position of "apparent power and authority."  (Doc. 197 at 285-286).

McFadden's indictment is likewise riddled with language describing how he utilized his power as an ATF agent to engage in his drug conspiracy, as well as in assisting the prosecution of Ms. Barnes and her father.  For example, his indictment summarized his abuse of routine powers as an ATF Special Agent, which included investigation of potential violations of federal firearms, violent crime, and drug trafficking laws, work in conjunction with the TPD, participating in interviews and interrogations, referring cases for prosecution to the United States Attorney's Office for the Northern District of Oklahoma and to the Tulsa County District Attorney's Office, preparing reports, testifying in the federal and

state courts before grand and petit juries, magistrates, and district judges and how he abused those powers in the course of his drug conspiracy.  (*See, e.g.*, DX 2 at ¶¶ 2, 4-5, 8-9).

McFadden did not profit personally from the set up and conviction of Ms. Barnes. While he withdrew $3,000 in ATF funds for a controlled buy that did not occur, McFadden gave the money to Henderson, and McFadden never saw any of the money again.  (Doc. 196 at 99; *see also* PX 7 at USA1 00063-65).  McFadden also understood that federal prosecutors had wanted to convict members of the Barnes family for years, and he was told that they were drug dealers who had evaded proper prosecution. Both Logsdon and McFadden testified that they understood that Henderson and AUSA Raley had wanted to charge Larry Barnes for years.  (*See* Doc. 196 at 42-43, 105, 110-111).  That testimony is consistent with Henderson's false report of the fabricated "drug buy," which indicated that "[i]t should be known that Larry Barnes has been an ongoing target for narcotics officers for many years.  He and his daughter Larita are continuing to act together to facilitate their drug enterprise."  (PX 2).  It also comports with the testimony of McFadden's prosecutor, Jane Duke.  (Doc. 197 at 295) ("With Ms. Barnes, one of the federal prosecutors here in the Northern District became aware [of the alleged controlled buy / set up of the Barneses] [a]nd that particular prosecutor had a long history of prosecution with this family [and] became interested in adopting those state charges and taking them federal.").

On the evidence in this case, the Court finds that McFadden's conduct against Ms. Barnes "constituted an abuse of power lawfully vested in him rather than an 'unlawful usurpation of power the officer did not rightfully possess.'"  *Barnes*, 707 F. App'x at 514. In addition, the evidence shows that McFadden did not personally profit from setting up

Ms. Barnes and that he participated in the prosecution of Ms. Barnes with knowledge that the government had wanted to prosecute the Barneses for drug activity for many years. Such evidence is "sufficient evidence of an intent to serve the government." *See id.* at 519.

### *State Marijuana Possession Charge*

After she was indicted on the federal charges stemming from the phony May 8, 2007 report of a controlled methamphetamine purchase, Larita Barnes was charged on December 14, 2007 with possession of marijuana, in Tulsa County Case No. CF-2007-6419. She had a small amount of marijuana in a little pill bottle in her purse, which her cousin had put there because the cousin did not want to drive with the marijuana. (Doc. 196 at 195).

Ms. Barnes testified that, in January of 2008, prior to the unsealing of her federal indictment, she was offered drug court on the state marijuana charge, which would have resulted in no prison time. (Doc. 196 at 201-202-203; *see* PX 30). However, upon the unsealing of the federal indictment on February 12, 2008, disposition of the state charge was deferred to await trial and sentencing on the federal charges. (*See id.* at 202-203).

Once Ms. Barnes was convicted on the federal charges and sentenced to 10 years in federal prison, she did not qualify for drug court, because she would be unable to complete the drug court program from federal prison. (Doc. 196 at 201, 207). As a result, on October 14, 2008, eleven days after her federal sentencing, Ms. Barnes pleaded guilty to the marijuana charge for a sentence that would run concurrent to the federal charge and would have been completed long before she would serve the 10-year federal sentence. (Doc. 196 at 207 ["at the time, it didn't even matter. I already had two ten-year sentences. I would

be done with the four years before I ever got out of [federal] prison."]). The state court sentenced her to four years, to run concurrent with Ms. Barnes's federal sentence. (PX 28).

### *Federal Agents' Discovery of McFadden's Illegal Conduct and Abuse of Power*

In late 2008, the federal government initiated an investigation into law enforcement corruption and abuse of power. Among other things, at that time, the government had information that McFadden had engaged in illegal and dishonest activities. The Northern District of Oklahoma United States Attorney's Office sought recusal from the investigation because that office had worked with McFadden. (Doc. 197 at 270, 315-316). Jane Duke, who was then the Acting United States Attorney for the Eastern District of Arkansas, was contacted by Jay Macklin at the General Counsel's Office for the Executive Office for United States Attorneys about taking on the law enforcement corruption case. (Doc. 197 at 269-270). Macklin asked her if she "would consider accepting a recusal from the Northern District of Oklahoma" because "the officer here . . . had been involved in a number of the cases in which the implicated officers had participated." (*Id.* at 270). Duke was appointed to the investigation.

Before the FBI began investigating McFadden, he had transferred to Lubbock, Texas. (Doc. 196 at 121; Doc. 197 at 316). According to Duke's testimony, federal officials made McFadden's ATF supervisor in Texas aware of the investigation and "worked with them to ensure that [McFadden] was not placed in a position where he would be an officer that would have to testify in court at all." (Doc. 197 at 316). That was because the prosecutors "were very concerned that all of these officers not be put in a position where it would compromise or lead to further judicial proceedings that would be called into

question." (*Id.*). Despite the concerns going forward, federal officials did not promptly determine whether Ms. Barnes had been falsely convicted upon the testimony of McFadden and Logsdon.[3]

It was not until June 10, 2009 that federal officials interviewed Ryan Logsdon, who immediately told them that the charges against Ms. Barnes and her father were fabricated. They requested that Logsdon take a polygraph, which he passed, and Ms. Duke then filed a motion in the Tenth Circuit to remand the Barnes appeal from her Federal Judgment and Sentence. The Tenth Circuit remanded to the District Court on July 1, 2009. The following day, District Judge Claire V. Eagan conducted a hearing, at which the government made an oral motion to dismiss the indictment and vacate the Judgment against Ms. Barnes. Judge Eagan granted the motion and ordered that Ms. Barnes be immediately released from federal prison.

---

[3]     From Ms. Duke's testimony, it appears that the government was likely concerned about *Giglio* impairment in future prosecutions, or the need to disclose potential impeachment information with respect to McFadden. However, for approximately six months after receiving information that McFadden was likely a corrupt criminal, the government did not file any notice in the underlying criminal proceedings that the convictions of Ms. Barnes or her father were based upon the testimony of an agent whose credibility was in serious question due to his own criminal conduct and corruption. Instead, even after receiving information regarding McFadden's corruption, the government filed its Answer Brief in the Barnes appeal. (*See* Answer Brief, filed 02/02/2009 in Appeal No. 08-5147). In that brief, the government specifically relied upon McFadden's trial testimony to bolster the government's position that the evidence was sufficient to convict Ms. Barnes on the two-count indictment. (*See id.*).

### *Ms. Barnes's Pretrial Detention and Incarceration*

After Ms. Barnes was arrested on state charges on December 13, 2007, she was unable to bond out of jail because the bond on the illegitimate state methamphetamine charges was too high. (*See* Doc. 196 at 196). Once the state methamphetamine charges were dismissed (after the unsealing of the federal indictment), Barnes was able to post the lesser bond of $2,500 (*see* PX 28 [12-18-2007 entry]) on the marijuana possession charge. On February 20, 2008, she was ordered to be released on bond in the state court pending disposition of the state marijuana case. (*See id.*). She was arrested and arraigned that same day on the federal indictment. (*See* PX 8 [Doc. entries 16, 17]).

The following day, a detention hearing on the federal indictment was held, the federal government withdrew its request that Barnes be detained, and she was released on a $10,000 unsecured bond "to US Probation for transportation to a treatment facility." (Doc. 16 in 07-CR-135-CVE). Ms. Barnes testified that she was transported to an Oklahoma Department of Corrections facility that housed pretrial federal defendants. (Doc. 196 at 204). She was there from February 22 or 23, 2008 until she was taken into federal custody following conviction on the federal charges on April 23, 2008.

After Ms. Barnes was sentenced on October 3, 2008, she was sent from the federal transfer facility in Oklahoma City to federal prison in Texas. Upon her release from federal custody in July, 2009, Ms. Barnes was transferred to Brazos County Jail in Texas, because she had not served the sentence imposed by the State of Oklahoma after her federal conviction and sentence. (Doc. 197 at 255; Doc. 196 at 227). From there, she was moved

around several prison and jail facilities across Oklahoma.  (*See* Doc. 196 at 227).  Ms. Barnes was finally released on November 10, 2009.  (Doc. 197 at 258).

Ms. Barnes testified at length about the indignities of her incarceration, including countless, humiliating, nude "bend over and cough" mass strip searches, being shackled to other women, an overall loss of dignity, being unable at times to access sufficient feminine products, and having no freedom.  (Doc. 196 at 208-210, 230).  Ms. Barnes worked in the washroom and as a butcher in food services at the federal prison in Bryan, Texas.   She would be off of work by noon or 1:00 p.m. each day, but she could not shower the blood or debris from the butcher job off until that night because of the restricted "shower hours." (*Id.* at 211).  As a result, she would have to go to dinner hours later in bloody clothes from her job.  (*Id.* at 212).  She described prison, overall, as "not really a life."  (*Id.* at 210).

At the time she was charged, convicted, and incarcerated on the fabricated charges, Ms. Barnes had five children.  The youngest was a baby girl, who was only four months old when Ms. Barnes was arrested and unable to bond out on the bogus state methamphetamine charges.  She had three other daughters, who were four, fourteen, and sixteen, at the time, and one son, who was eight years old.  (*Id.* at 203-204).  When she was detained in the Tulsa County Jail, her children were not allowed to visit her. After she was arraigned on the federal charges and released to be transferred to a treatment facility, she was able to see her children only a few times. (*Id.* at 204-206).

There are still lingering problems due to her incarceration during her baby's first few years of life, because Barnes was in prison during a crucial bonding time for a parent and her child, and so they do not have a proper bond. Barnes was incarcerated, and thus

absent from the baby's life, when the baby learned to sit up, crawl, talk, and took her first steps, and Barnes missed her baby's first and second birthdays and all holidays with her children while she was incarcerated. (*Id.* at 245).

When Barnes first got home from prison, her youngest child was only two years old, and she did not recognize Barnes as her mom. (*Id.* at 243-244). There are no pictures of Barnes with her youngest daughter during those crucial early milestones. (*Id.* at 245). The youngest daughter still cries when Barnes leaves her, she questions Barnes's authority, and she does not understand what happened. (*Id.* at 243).

Ms. Barnes's next youngest daughter was between four and six years old when Barnes was incarcerated and, when Barnes was released, her then-six year old was calling someone else mommy. (*Id.*). Barnes also missed her teenaged daughters' first dance and was absent during a time of significant change for teenagers. (*Id*.). In addition, while incarcerated, Barnes was unable to attend the baseball and basketball games of her son Herschel, and to join him in outdoor activities, all of which she had shared with him before she was imprisoned. (Doc. 197 at 242).

Most tragically, Herschel died on February 5, 2009, while his mother was still incarcerated. (PX 32). He was nine years old. (*See id.*). Herschel was staying with his grandmother in Mannford, Oklahoma, and had just exited the school bus, when a driver who was under the influence ran over him, causing blunt chest and abdominal trauma, killing him. (*See id.*; Doc. 197 at 212-213). Barnes testified about her excruciating suffering upon learning about her son's tragic death and upon being unable to be present to grieve with and comfort her children due to her incarceration. She also described her

efforts to attend his funeral, which were cruelly rejected by prison staff. (*See* Doc. 196 at 215-223). She was unable to properly grieve or communicate about Herschel's death because of her incarceration. (*Id.* at 220-221). She had limited minutes she could use to talk to family via telephone. When her son died on February 5, she had 30 minutes left of her 300 allotted minutes per month. (*See id.* at 222). To help her not cry all the time, the prison psychologist and doctor had her take Prozac. (*Id.* at 222-223).

Ms. Barnes's 12-year old nephew died just two months after Hershel died. After being denied the ability to attend her son's funeral, she knew that she would not be allowed to leave to attend her nephew's services. She was also short on phone minutes when her nephew died. (*Id.* at 223).

Ms. Barnes has suffered from feelings of guilt, depression, and mental anguish as a result of being unable to be present for her five children while she was incarcerated, including during the last year of her son's life. (*Id.* at 246-247). When she was sentenced to ten years, she suffered from anxiety over concern for her children, and she continues to suffer from anxiety, in light of her ongoing fears. She suffered and suffers from guilty feelings about having been away from her children, and she frequently wondered whether her son would not have been run over if she had not been in prison, but had been with him instead. (*See id.*). She feels depressed because she "can't change things . . ., can't get those two years back . . ., can't give them back to [her] kids," and she knows that her children suffered due to being without their mother for almost two years. (*Id.* at 247). After she was released from prison, Barnes saw a psychiatrist for several months, which cost her $120 every visit, an amount she could not afford. (*Id.*).

Nightmares have continued to plague Ms. Barnes since 2008. The nightmares involve not being with her children or "somebody lying and going through it again." (*Id.* at 230-231). Because of fear, she moved her family away from Tulsa to a town where she is not afraid of the police. (*Id.* at 236).

### *Reduction of the State Sentence to the Mandatory Minimum*

On August 12, 2009, after she was released from federal custody, Ms. Barnes filed a Motion to Modify Sentence in state court. (PX 30). In that filing, Ms. Barnes represented that she had previously been offered the state drug program, which became impossible after her sentence to federal prison. (*Id.*). Given that the federal sentence had been vacated and she had been released from federal custody, the purpose of the motion was to request immediate release from state custody. (*See* Doc. 196 at 232; Doc. 197 at 255). The docket for the state case reflects that the judge in that case promptly set the motion for hearing, held a hearing, and granted the motion, reducing the state sentence to two years. (PX 28).[4]

### *Charges and Conviction of Brandon McFadden*

On April 7, 2010, McFadden was indicted in Case No. 10-CR-58. He was the first law enforcement official to be indicted in connection with the Tulsa corruption prosecution. (Doc. 197 at 275-276). Ryan Logsdon is referred to in McFadden's indictment as "Individual 1." (*Id.* at 278, 291).

---

[4] The state statute to which Ms. Barnes pleaded guilty carried a sentence of "not less than 2 years nor more than 10 years" imprisonment. *Okla. Stat.* tit. 63, § 2-402(B)(2); *see also* PX 31. The state judge re-sentenced Barnes to the mandatory minimum on the statute to which she had pleaded guilty following her federal conviction. (*See* PX 31).

McFadden ultimately pleaded guilty to count one of the indictment, conspiracy to distribute methamphetamine. (DX 3; Doc. 196 at 130-131). During his plea colloquy as to that count, McFadden admitted that he had conspired with others to distribute methamphetamine. He further summarized his conduct as follows:

> During the time period, that I used the position as a special agent with ATF to further the drug conspiracy and abused my position as a special agent. During this time, myself and Henderson seized drugs and money which were kept for our own personal benefit, falsified investigative reports, and failed to document events, and obstruct[ed] justice through falsely [sic] testimony under oath and persuading other individuals to do the same.

(DX 5 at 17). He also admitted that he "testified falsely" in the Barneses' criminal trial and that he "got Ryan Logsdon to testify falsely that he made a controlled buy from the Barnes [sic] on May the 8th of 2007, when, in fact, it did not happen. Both the Barnes [sic] were convicted on jury trial based on the false testimony of myself, Logsdon, and Henderson." (*Id.* at 19).

### *Damages*

### *a.     Actual Damages*

Upon considering all of the evidence in the case, the Court finds that $5,000,000 in actual damages, which is the amount Ms. Barnes sought in her administrative claim (*see* DX 18), will reasonably and fairly compensate her for all damages she sustained as a result of McFadden's wrongful conduct. That amount will compensate her for her loss of freedom and liberty during the duration of her detention and incarceration on false methamphetamine charges, as well as her extreme mental pain and suffering, emotional distress, physical discomfort and inconvenience, and reasonable expenses of any ongoing

medical or psychiatric care, treatment, and services necessary to attempt to remediate the severe harm inflicted upon her. Barnes spent months under criminal prosecution for crimes she did not commit, which forced her into a criminal trial in federal court premised upon false evidence provided as a result of McFadden's abuse of the power lawfully vested in him as a Special Agent of the ATF. She was convicted, sentenced, and imprisoned at the conclusion of that trial.

Despite her actual innocence, Barnes lost her liberty and the ability to move about freely. Federal prison also deprived her of watching her children grow during the many months she was incarcerated on fraudulent charges, and she was unable to enjoy the day-to-day joys that non-imprisoned citizens do. She was not only prohibited from spending any significant time with her children, all of whom were minors at the time of her arrest and incarceration, but she was also limited to the equivalent of approximately 10 minutes per day of phone time (300 minutes per month) to talk to every person she loved.

As noted, Ms. Barnes was in custody during her youngest daughter's first milestones – sitting, crawling, walking, talking, first and second birthdays – and that separation and absenteeism caused her significant mental anguish and distress and permanently harmed her bond with her child. The two-year-old did not recognize her when she was released from prison. Barnes missed important events and milestones of her other children, as well, including basketball and baseball games, first dances, outings, and every one of her children's meals and bedtimes, while she was incarcerated. The emotional distress suffered as a result was extremely severe and lasted for years.

Barnes was unable to properly grieve the death of her nine-year-old son, to be present for her other children during their own grief, to attend her son's funeral, or to express sadness, because she was in prison, which did not allow those things. Her description of the cruel, miserable anguish she suffered while incarcerated at that time made a lasting impression on the Court. She felt extreme guilt and suffered insomnia as a result of not being present for her family, and she is tortured by thoughts that her son might not have been run over if she had not been in prison at the time.

Ms. Barnes again suffered in prison without being able to be with her family after a second tragic loss, of her nephew. She was prescribed Prozac in order not to cry constantly, as the prison officials did not want her to be disruptive in the facility.

Prison also inflicted humiliation and its attendant emotional distress upon her. She was subjected to "bend over and cough" naked searches where she was lined up with other women, she was shackled to others, and endured restrictions on shower time, feminine products, clothing, phone time, and contact with loved ones. All of these resulted in suffering a loss of liberty and dignity. In short, during her almost two years in custody as a result of methamphetamine charges of which she was innocent, she did "not really [have] a life." (Doc. 196 at 210).

As noted, because of her federal prosecution and imprisonment, Ms. Barnes suffered terrible nightmares, depression, and insomnia. She moved away from Tulsa out of fear caused by the prior fictitious charges that had landed her in custody.

### b.    Disposition of the Marijuana Charge and Ms. Barnes's Guilty Plea on that Charge were Directly Influenced by the Federal Conviction and Sentence

The government requests that the Court find that Ms. Barnes suffered zero damages from her incarceration. That argument is premised upon the government's contention that, even had McFadden not abused his power as an ATF Special Agent in assisting the illegitimate prosecution of Ms. Barnes, she would have been incarcerated on the separate state marijuana possession charge.

However, it is impossible to unwed the sentence on the marijuana charge from the sham federal prosecution and the sentencing of Ms. Barnes. Temporal reality does not support the government's position. The evidence establishes that the four-year sentence to which Ms. Barnes agreed on the state marijuana possession charge was directly influenced by or dependent upon the federal conviction and ten-year sentence. Disposition of the state marijuana charges was delayed several times, to be completed only *after Ms. Barnes's federal trial and sentencing.* (*See* PX 28 at docket entries 04-03-2008, 05-05-2008, 06-02-2008, 08-25-2008, 09-12-2008, 10-13-2008, 10-14-2008). That, alone, indicates that the state judge and state prosecutors deferred determination of the marijuana charge until *after disposition of the fraudulent federal methamphetamine charges.* The state judge's sentence on the marijuana charge expressly referenced and was run concurrent to the sentence in the federal case. (*See* PX 28 at docket entry 10-14-2008).

Moreover, Ms. Barnes was entirely credible, and her testimony made logical sense, as to the reason she agreed to the plea she entered on the state marijuana charges: "at the time, it didn't even matter. I already had two ten-year sentences. I would be done with the

four years before I ever got out of [federal] prison." (Doc. 196 at 207). The only record evidence as to the seriousness of the state marijuana possession offense is Ms. Barnes's testimony that she had a small amount of marijuana in a little pill bottle in her purse and the fact that bond on the marijuana charge was set relatively low, at $2,500. Barnes testified that she was initially offered participation in the state drug court program, which became impossible once she was convicted and sentenced to ten years in federal prison. The seriousness of the marijuana possession charge compared to her bogus federal convictions for conspiring to distribute 50 grams or more of methamphetamine and for maintaining a drug premises lends further credence to her testimony that she would have received drug court without incarceration, but for her federal conviction and sentence.

The state court's granting of the motion to reduce sentence is further evidence that the original disposition of the marijuana charge was dependent upon the federal conviction and sentence. Once advised that the federal charges were premised upon fabricated evidence and perjurious testimony, the state court judge reduced Barnes's sentence on the marijuana charge to the lowest possible sentence that could be given for the statutory offense to which Ms. Barnes had pleaded guilty.

### c. Setoff of Consideration Paid by Joint Tortfeasor in Settlement

There is no dispute in this case that Jeff Henderson, a TPD Officer, was a joint tortfeasor with respect to causing Ms. Barnes's injuries. At trial, the government introduced evidence that the City of Tulsa paid Ms. Barnes $300,000 in settlement for her injuries arising out of the tortious conduct of Henderson. (Doc. 197 at 252-253). The amount of

Ms. Barnes's damages here should accordingly be reduced by the amount the City of Tulsa paid to Ms. Barnes as consideration in that settlement. *See Okla. Stat.* tit. 12, § 832(H).

## CONCLUSIONS OF LAW

### A.    Jurisdiction, Venue, and Exhaustion of Administrative Remedies

The Court has jurisdiction of the parties and subject matter to hear and determine liability and damages pursuant to 28 U.S.C. §§ 1346(b).  Venue properly lies in this District pursuant to 28 U.S.C. § 1402(b).  Plaintiff exhausted her administrative remedies as required under 28 U.S.C. § 2675(a).  She thereafter timely filed this suit within six months after the date of the government's mailing of notice of final denial of the claim.  28 U.S.C. § 2401(b).

### B.    "Within the Scope of Employment" Under the FTCA

As a sovereign, the United States is immune from suit except to the extent that it consents to be sued.  Where it has consented to suit, "the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit."  *United States v. Sherwood*, 312 U.S. 584, 586 (1941).  Congress has provided a limited waiver of the sovereign immunity of the United States in the FTCA.  *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 852 (10th Cir. 2005).  The statute provides:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the *negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment*, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1) (emphasis added); *see also* 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages").

"Under the FTCA, the government is liable only for tortious acts committed by employees 'acting within the scope of [their] office or employment.'" *Fowler v. United States*, 647 F.3d 1232, 1237 (10th Cir. 2011) (quoting § 1346(b)(1)). "'Scope of employment' is determined by the law of the place" where the alleged actions occurred. *Id.*; *see* 28 U.S.C. § 1346(b)(1). Here, Oklahoma law applies to the "scope of employment" determination with respect to McFadden's conduct. *See Barnes*, 707 F. App'x at 516-17.

Under Oklahoma law, "one acts within the scope of employment if engaged in work assigned, or if doing that which is proper, necessary and usual to accomplish the work assigned, or doing that which is customary within the particular trade or business." *Tuffy's, Inc. v. City of Oklahoma City*, 212 P.3d 1158, 1163 (Okla. 2009). An act by an employee is also within the scope of employment "if it is done, however ill-advisedly, with a view to further the employer's interest or arises out of an emotional response to actions being taken for the employer." *Id.* at 1166. "[A]n employing [governmental entity] is immune as a matter of law only if an officer's acts are so extreme as to constitute a clearly unlawful usurpation of authority the officer does not rightfully possess." *Id.* at 1167 (discussing *DeCorte*, 969 P.2d at 360).

"An officer's illegal misconduct may be accomplished through an abuse of power lawfully vested in the officer, instead of by an unlawful usurpation of power the officer did

27

not rightfully possess." *Id.* An abuse of lawful power is within the scope of employment, while an unlawful usurpation of power is not. *See id.* "[A]n employer can be held liable even if the employee acts beyond the given authority" so long as the act was "incident to some service being performed for the employer." *Barnes,* 707 F. App'x at 517 (quoting *Rodebush v. Okla. Nursing Homes, Ltd.*, 867 P.2d 1241, 1245 (Okla. 1993)).

In reversing and remanding the Court's earlier grant of summary judgment, the Tenth Circuit examined *McGhee v. Volusia Cty.*, 679 So.2d 729, 733 (Fla. 1996), because "the Oklahoma Supreme Court has embraced a test formulated by the Florida Supreme Court." *Barnes*, 707 F. App'x at 517 (citing *DeCorte*, 969 P.2d at 362). As summarized by the Circuit, "The line between abuse and usurpation is not the line between legal and illegal acts. An 'officer's misconduct, though illegal,' may be 'accomplished through a[n] abuse of power lawfully vested in the officer.'" *Id.* (quoting *DeCorte*, 969 P.2d at 362).

The Circuit cited numerous examples from *McGhee* and "look[ed] to [other] Florida cases for guidance in applying [Florida's 'abuse/usurpation test']" as providing examples relevant to McFadden's conduct. *Id.* at 517-18. The court noted that, in *McGhee*, "deputies lunged at the plaintiff, grabbed him by the throat, and began kicking him with force." *Id.* at 517 (citing *McGhee*, 579 So.2d at 730). "In ruling for the plaintiff, the *McGhee* court wrote, 'The fact that [the deputy] may have intentionally abused his office does not in itself shield the sheriff from liability,'" as the "deputy 'clearly had the lawful authority to restrain arrestees, detain them, or even respond with force in appropriate situations,' and it held that 'he therefore cannot be described as a usurper.'" *Id.* (quoting *McGhee*, 579 So.2d at 730).

The Tenth Circuit discussed two other Florida cases cited in *McGhee*. In one, an officer was alleged to have arrested a child pretextually for the purpose of sexually molesting her. *Barnes*, 707 F. App'x at 517 (citing *Hennagan v. Dep't of Highway Safety & Motor Vehicles*, 467 So.2d 748, 749 (Fla. Dist. Ct. App. 1985)). "'The officer's misconduct, though illegal, clearly was accomplished through an abuse of power lawfully vested in the officer, not an unlawful usurpation of power the officer did not rightfully possess." *Id.* (quoting *McGhee* [referencing *Hennagan*], 679 So.2d at 732). In another Florida case cited in the Circuit's decision as to the abuse / usurpation dichotomy, a police officer used excessive force in committing a false arrest, which "'showed a case of lawful power abused, not of an unlawful usurpation of authority.'" *Id.* (quoting *McGhee*, 679 So.2d at 732).

Based upon the abuse / usurpation test, the Tenth Circuit concluded that the undersigned erroneously granted summary judgment to the defendant in this case:

> *The heinous acts of McFadden that harmed Ms. Barnes were performed in the normal course of his duties – preparing for trial and testifying. The government's arguments to the contrary are not persuasive.*
>
> The government first argues that McFadden was acting outside the scope of his authority because "a federal law enforcement officer is never authorized to frame a person known to be innocent." But an officer is also not authorized to use excessive force or commit sexual assault. Although McFadden, like the officers in the above cases, employed his power "contrary to the law of its use" and "use[d] it improperly and to excess," he did not assume a function that had not been assigned to him. *McFadden could not have performed his authorized duties more despicably, but he was acting within the customary scope of his duties*.
>
> The government also argues that it is not liable under general respondeat superior law because McFadden was acting for his own purposes (pursuing the conspiracy that had greatly enriched him), not the interests of the United

States. The underlying proposition finds support in Oklahoma law. . . . In the law enforcement context, however, the courts have generously construed the breadth of an officer's purpose, perhaps because public-policy concerns generally make it "appropriate to hold [the law-enforcement agency] responsible for [an officer's] acts." With great power comes great responsibility, and the powers of law-enforcement officers are unique in our society. Police agencies are expected to strictly control misbehavior by their own officers. Thus, the courts of Oklahoma and Florida have said that an officer may have in mind a governmental purpose when he abuses a prisoner, uses excessive force in a false arrest, assaults nightclub patrons, or even arrests a child for the purpose of sexually abusing her.

*Barnes*, 707 F. App'x 518-19 (internal citations and parentheticals omitted) (emphasis added).

The evidence at trial was more favorable to the plaintiff than the summary judgment record upon which the Circuit announced that McFadden's acts "were performed in the normal course of his duties," "he was acting within the customary scope of his duties," and there "was sufficient evidence of [McFadden's] intent to serve the government." *Id.* Thus, considering the evidence at trial in light of the Tenth Circuit's opinion on the prior appeal in this case and the foregoing Findings of Fact, the Court concludes that McFadden's conduct "constituted an abuse of power lawfully vested in him rather than an 'unlawful usurpation of power the officer did not rightfully possess,' and . . . his motives included serving a government purpose." *Barnes*, 707 F. App'x at 514 (quoting *DeCorte*, 969 P.2d at 362).

## C.    Tort Damages

The FTCA limits the plaintiff's damages to the amount stated in her administrative claim. 28 U.S.C. § 2675(b). The evidence establishes that plaintiff is entitled to recover damages on her tort claims for false arrest, false imprisonment, and intentional infliction

of emotional distress (IIED) under Oklahoma law. *See, e.g., Allen v. Town of Colcord, Okla.*, 874 F. Supp. 2d 1276, 1288-89 (N.D. Okla. 2012) (false arrest and false imprisonment are virtually indistinguishable under Oklahoma law; false arrest is an arrest without probable cause); *Chellen v. John Pickle Co., Inc.*, 446 F. Supp. 2d 1247, 1291-92 (N.D. Okla. 2006) (false imprisonment is the unlawful restraint of an individual's personal liberty, which requires the detention of a person against her will and the unlawfulness of the detention; and "all who by direct act or indirect procurement, personally participate in, or proximately cause, the false imprisonment or unlawful detention o[f] another are liable"); *Estate of Trentadue*, 397 F.3d at 855-56 (IIED claim under Oklahoma law requires proof that (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe).

It is undisputed that Ms. Barnes did not commit the methamphetamine-related crimes for which she was charged in state and federal court and of which she was convicted in federal court and sentenced to ten years in prison. McFadden provided false evidence to substantiate the charges, while knowing the charges were false. His conduct resulted in an arrest and prosecution that he knew were without probable cause, and by direct action and indirect procurement, he personally participated in and proximately caused the unlawful incarceration of Ms. Barnes. McFadden's actions were intentional, extreme, and outrageous, which caused the plaintiff emotional distress, and there is substantial evidence in the trial record that the emotional distress was severe and lasted years.

For actual damages, Ms. Barnes is entitled to an amount of money that will reasonably and fairly compensate her for all injuries sustained as a result of McFadden's wrongful conduct, which the Court has found to be within the scope of his employment. Damages may compensate for physical pain and suffering, past and future; mental pain and suffering, past and future; emotional distress; physical discomfort or inconveniences; physical illness or injury; and the reasonable expenses of any necessary medical care, treatment, and services, past and future. *See* Okla. Uniform Jury Instructions – Civil, No. 4.1; *id.*, No. 20.4; *see also* 28 U.S.C. § 1346(b)(1); *id.*, § 2674 ("The United States shall be liable [for torts under the FTCA] in the same manner and to the same extent as a private individual under like circumstances." The United States shall not be liable for punitive damages under the FTCA. 28 U.S.C. § 2674.

## SUMMARY OF DECISION

Based upon the foregoing Findings of Fact and Conclusions of Law, a judgment will be entered in favor of the plaintiff and against the defendant, in the amount of $4,700,000, which represents the total amount of plaintiff's actual damages ($5,000,000) minus the $300,000 paid on behalf of the joint tortfeasor to settle with Ms. Barnes.

SO ORDERED this 17th day of February, 2020.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT